Good morning ladies and gentlemen. Before we start I have two announcements for you. The first is that Judge Rovner is participating with us but she will be on the video screen that you have there and you should be able to see her. You might want to just give an extra half a minute or just a bit of time to make sure that the sound catches up with the video. And the other thing I was going to announce is that case number four on this morning's docket, Owens v. Old Wisconsin Sausage, is the case in which the court received a motion, an emergency motion yesterday morning at 11.30 in the morning, but of course nobody was here because it was Memorial Day, asking that we postpone the oral argument and so the court is removing that case from the oral argument calendar for this morning and further order of the court will discuss what we decide to do with it. And our apologies to the lawyer for the other side. I don't know if that word got to the other side but this seems to be the only thing that we can do. So we will proceed with those comments. We will proceed to our first case for this morning which is Harlan v. Scholz. Mr. Franklin. Good morning, Your Honors, and may it please the court, David Franklin, Illinois Solicitor General for the members of the Illinois State Board of Elections. Your Honors, before I begin, I'd just like to say a word or two about the mootness issue. As you know, the plaintiffs asked for and got a preliminary injunction from the district court which would have shut down election day registration, or EDR as I'm going to call it from now on, in the precinct polling places throughout Illinois. So Mr. Franklin, just to verify, we did a quick look through the record. I didn't see a separate injunction along the lines of Rule 65 of the Rules of Procedure. We just have this opinion from Judge DerGhigian, is that correct? That's my understanding, yes. Okay, so, which isn't actually procedurally correct. But anyway, that's what we've got. Thank you. And I have a question, please. Given that the preliminary injunction ordered the defendants to direct the election authority of each county in Illinois not to implement election day voter registration at the precinct polling locations, why do you think we should now read it as limited to the November 2016 election? I have my own ideas about that, but is there any support in the record for that characterization that you can actually point to? Well, Judge Robner, our position is that the best reading of the injunction order is that it's not limited to the November 2016 election. We were frankly surprised to see the plaintiffs argue that in their responsive brief in this court, and they further argue that on that basis this appeal should be dismissed as moot. We think that's, on balance, probably wrong because the injunction order, although as Chief Judge Wood pointed out, there isn't a separate injunction order, but the language of the order in which the injunction is found is not expressly limited to that election. But practically speaking, and this is the point I wanted to make, what we're asking for and what they're asking for are essentially the same thing. It's been our view all along in this appeal that the plaintiffs are not now, and were never entitled to preliminary injunctive relief. Now they come and say they want this court to declare that the relief that they asked for and got is no longer effective, and it's frankly hard to see how that's compatible with any claim of irreparable harm. We don't think the plaintiffs had irreparable harm at the time they first moved for an injunction or preliminary injunction. We certainly don't think they have irreparable harm now, and we think their request to moot this appeal is further evidence of the lack of irreparable harm. There's plenty of time for the district court to resolve the claims on the merits. Indeed, discovery is ongoing. Discovery and briefing schedule has been set, which would allow the case to be fully litigated before the first statewide election, which is next March, so about nine and a half months from now. So just to be clear, the state's position is that the preliminary injunction against the statute should be vacated, and the case should be permitted to move forward as it will in the district court? That's our primary position, Your Honor. That's right. That's our preferred disposition of this case on the grounds that the plaintiffs were never entitled to a preliminary injunction. They haven't shown irreparable harm. They more or less confessed today that they don't face irreparable harm going forward, and we don't think they've shown a likelihood of success on the merits. Having said all that, as we say in our briefs, we're not averse to a dismissal on mootness grounds. Where would that leave, in your view, the district court's opinion that is now before us? Because, of course, dismissal on mootness grounds doesn't always automatically lead to erasing the district court's decision. Yeah, our position is that if this court were to dismiss on mootness grounds, it would follow, I assume, its ordinary procedure, which is not to vacate the underlying preliminary injunction, but that's a formality or technicality, because what we would certainly ask for is that if this court takes the dismissal route, if this court declares this appeal to be moot, we'd very much like for this court to state clearly that the injunction has lapsed, that it's no longer of any legal force or effect, and so the fact that it hasn't been vacated really wouldn't matter, and of course it doesn't have any, even if it were somehow still in effect and not vacated, it wouldn't have any effect in terms of law of the case, it wouldn't have any effect in terms of preclusion, so we're not going to quarrel about that. Right. So, I mean, a mootness dismissal would have to require reading Judge Drayegian's order that includes the injunction as limited to the November 2016 election. That's right. I think there's some case to be made for that just in the sense that if an injunction is ambiguous, Rule 65 cautions that courts should read it narrowly in order to avoid defendants laboring under the shadow of contempt. We don't think this injunction is particularly ambiguous. Now, we do recognize that in the memorandum of law that the plaintiffs submitted in support of their request for a preliminary injunction, there was language where they asked for an injunction that was limited to last November's election, but their actual, yes? You say that you don't think it's particularly ambiguous. Do you think it's ambiguous at all? The four corners of the order in which the injunction is articulated are not ambiguous at all. That's our position. So, let me just ask you a merits-related question, assuming we, I mean, obviously we will consider mootness argument, but the assumption is made by your opponents that if there were some sort of problem in the distinction between the counties that have mandatory same-day registration and those that have a more limited version of it, I mean, there's still, everybody has some same-day registration, but the widespread quality varies. I mean, the way I always think about this, you can either equalize up or you can equalize down, and it seemed that the district court's order thought that you had to equalize down and wipe it out everywhere, but one could also have imagined saying that the way to equalize was to compel those counties that are not doing as much as more populous counties to do the same thing. Isn't that right? That is right, Your Honor. The leveling up versus leveling down problem is pervasive in equal protection contexts, and it certainly was presented here by Amiki below, the ACLU and others submitted a brief that took no position on the merits, but argued that if there were to be an injunction, it should be, as it were, a leveling up one. Are somebody exploring in the underlying proceedings what the actual impact in the less populous counties is? I suppose here's what I was wondering. You know, if one of the less populous counties has only three or four precinct polling places or some number, you know, a small number, and one can get registration at the county clerk's office and one of the 20% cities and maybe a third place, maybe there's not that much of a difference, but I don't know what the number of precincts would be in those counties. Discovery has just begun below. I don't know that that level of granularity has been reached yet in Discovery. I do know that on this record with respect to this preliminary injunction, the plaintiffs didn't put in any evidence with respect to that kind of issue, the distances between ordinary polling places. Well, exactly. You know, you're driving 10 miles or 13 miles. That's what I'm wondering. No evidence at all in this record to support the idea that voters or would-be voters, registrants in the smaller counties would be meaningfully inconvenienced, much less severely burdened by having to presumably drive to, let's say, a county clerk's office or a 20% jurisdiction. I would imagine, Mr. Solicitor General, that in the rural counties in Illinois, there are a lot of people who don't have their own car or can hop in a car and go to the county seat. Rural Illinois, that's not for everybody. I agree, Judge Ripple. There may be some people like that. You'd have to have a person who, just to be clear, didn't register during the ordinary registration period either by mail or online, did not take the opportunity to register during the 28-day grace period at any of the locations where that's available, shows up to their polling place in a smaller county on election day, late enough in the afternoon or perhaps early evening, such that they can't make it to a centralized location. It's the plaintiff's burden to come forward with at least some evidence that those people exist. I don't doubt that they might exist, but there's nothing in the record. The briefs were a little shy on the issue of funding state elections in Illinois, especially for those of us who don't live in the state. Is all funding local? My understanding is that the bulk of it is handled locally by the county election authorities or the other local election authorities, so that, for example, the cost of obtaining electronic poll books, which are basically laptop computers that are loaded with election management software and then securely connected to the county election authorities voter database, that would be at least ordinarily borne by the local election authorities. I'm sure that the legislature could fund it, subsidize it, require them to pay. There are a range of options there, but my understanding is that that's generally handled locally. I do want to come back to, Judge Wood, your question about leveling up versus leveling down. I'm not sure that my answer is going to be all that satisfactory to you. My client, the State Board of Election, their job is to implement the law as it is on the books. They're not in a position to take a position on what the preferable remedy would be between a leveling up and a leveling down remedy, so I'm really not authorized to sort of give a preference. I can tell you that I certainly see some appeal to the idea that when you've got an amenity like polling place election day registration that's currently available in counties that cover about 85 percent of the state, and you've got legislation that's clearly intended to enhance rather than curtail the right to vote, a leveling up remedy in some sense would be more consistent with that intent, and to the extent that fashioning a remedy is an exercise in doing the least violence possible to the legislative design, one could see the appeal in that, but I just can't take a position on that. Okay, that's fine. Go ahead. But do you have a view on whether or not there's voter suppression? As a result of this scheme, Your Honor? Yes, we do have a view. There's no voter suppression here. There's been no showing of what the Anderson verdict test requires as a threshold for strict scrutiny, right, which is severity of burden. So isn't their argument, it's kind of a, suppression isn't quite the right word, but there's a relative enhancement of voter access in the counties that have mandatory same day that is relatively greater than those counties that have the option but have not exercised that option. That is their argument. I think that's the best spin that one can put on their argument, Your Honor. I agree with that. Several responses. First, everybody agrees that the Anderson verdict test, whether we're talking about a discrepancy, as Your Honor has put it, or we're talking about a standalone alleged curtailment, it doesn't matter. The Anderson verdict test still requires that there be a threshold showing of severe burden. I think the way to do that in this context would be to say, is the ease or convenience of voting for persons in the less easy or less convenient, right? Is the discrepancy severe? Right. And don't we need to be looking at the people who as of election day haven't yet registered? I mean, I don't know what the statistics would show about the rural counties in terms of stability of population because if the population tends to be more stable then there might not be as many unregistered people anyway as some sort of fluid area like Chicago that people are moving in and out of all the time. I think that's a fair observation, Your Honor. That's one of the many fact issues that just hasn't been ventilated in this case on this record. The plaintiffs made no effort to show that the smaller counties feature significant numbers of the younger, more residentially mobile voters for whom their own expert says that the in-precinct version of EDR is especially helpful. So I see that I'm into my rebuttal time. I think maybe if the Court doesn't have any further questions, I'll take my seat for now. Apparently not, so you may do so. Thank you. Mr. Hubert. May it please the Court. The Court should seal because it is moot. The defendants seek review of an injunction. Mr. Hubert, your preliminary injunction motion that was granted was not limited to the November 2016 election but sought an order that would direct the election authority of each county to implement election day voter registration at precinct polling locations. So my question to you is, are you now moving to withdraw that motion or to narrow it in its scope to just the November 2016? Which is it? Your Honor, the motion for preliminary injunction didn't say much of anything about the basis of plaintiff's motion, but the memorandum in support specifically requested an injunction for the 2016 general election. And it only makes sense that the plaintiffs would only be concerned with the November 2016 election at that time. One reason is because Plaintiff Patrick Harlan was only a candidate in the November 2016 election, so he didn't need any relief beyond that election. But Mr. Hubert, I mean, I have looked through. It's one of the reasons why Rule 65 exists, I'm going to say, and it's very unfortunate that it was not complied with here. But I have scoured the District Court's order to see either language in it that would point to a limitation to the September 16, sorry, to the 2016 election or anything. And it's just not here. And it's the District Court's decision that we are reviewing, not anything you might have put in a memorandum of law or not anything that you put in a motion. So, and certainly Illinois runs lots of elections just like every state does. There will be elections that may not have been covered by this, but certainly, you know, nine months isn't that long in the election cycle. So I'm just concerned to try to read the District Court's opinion to include a limitation that the District Court never says a word about. Well, Your Honor, as you pointed out earlier, the District Court really didn't specify the relief that it was providing at all. And that's why I don't see where we can amend the District Court's order to put in such a limitation when, in fact, Illinois has an election code. Elections happen all the time. There's nothing to say that with the pace of litigation, maybe this will still be a live issue. I hope it isn't. I hope it gets resolved. But I just don't see this injunction as something limited to November 2016. Mr. Schultz is going to be a voter. I'm sorry, Mr. Harlan is going to be a voter. Whether he decides to run again or not, it's up to him. But I don't, I just don't see where this court has the authority to change the underlying opinion that we're being asked to review. Well, the relief the District Court provided can only be gleaned from looking to what the plaintiffs asked for. No, I don't see that at all. What the District Court says at the very end is it goes through all of these things. Plaintiff's motion for preliminary injunction and it's clear from the beginning of the order that it deals with SB 172, the permanent Election Day registration system. He describes that system for quite a while and describes the fact that there's a motion, injunction ordering defendants to direct election authorities in all 102 Illinois counties not to implement the EDR option of registration at precinct polling locations, period. That's where I would have expected the phrase for the November 2016 election to appear. But that's at the top of page 3 of the District Court's opinion and that's where the court's telling us what it's doing. Well, I would just add, Your Honor, that the party's arguments below, particularly with respect to the balance of harms and the public interest, focused largely on the November 2016 election and the motion's timing relative to the November 2016 election. The defendants essentially argued that an injunction would come too soon before the election and the plaintiffs essentially argued that it wouldn't. And the question of whether an injunction is appropriate for the November 2018 election really is a different question than whether one was proper in September 2016 for the November 2016 election because the timing issue would be different and if the plaintiffs were to file a motion now or in the near future for an injunction for November 2018. Well, March Well, I don't know that the plaintiffs have an interest here with respect to the March 2018 election because Patrick Harlan isn't a candidate for the March 2018 election and the Crawford County Republican Party's interest is to ensure that would-be Republican voters in Crawford County are on an equal footing with would-be Democratic voters. Why doesn't Crawford County just implement, nothing in this law prevents Crawford County from having an election registration spot on every street corner? Well, It's perfectly free to do that. I mean, the state legislature has said we're not going to impose on counties that may have tighter budgets or that may for some reason feel that they've offered enough. Maybe they have a very high registration rate already and they don't have much turnover in terms of the population of the county. I can imagine localities coming up with all sorts of rational decisions that don't add up to any kind of relative disadvantage. Well, it's a disadvantage where you're guaranteeing this to voters in high population counties regardless of any specific factors in those counties and you're not guaranteeing it to voters in these localities. Well, but you are guaranteeing to voters in the other counties that they can go to the county clerk's office, they can go to a municipal precinct location if it has 20% of the third spot. It can establish a third spot. As far as voters who have mobility issues, you know, getting access to a car, I mean, they have that issue for voting period, whether they're registered or not. So I don't think that helps you much. Well, it's a matter of common sense that voter turnout is going to be higher in places where you can simply walk into your local precinct polling place and register and vote on election day. How many people are not registered yet? I mean, aren't those facts important? I think that it's actually a very liberal regime, even for counties who lack electronic poll books. Do we know how much those books cost, by the way? We don't have evidence in the record on that at this time. Presumably that evidence will be developed as the case proceeds. Wouldn't it make a difference if they cost, you know, $800 versus $10,000? Well, certainly if they only cost $800, that would tend to disprove the state's justification for this law, which is that it would be too burdensome for low-population counties' election authorities to implement in-precinct election day registration. Why doesn't it, why wouldn't it also show, though, that any county that had the slightest concern about access of its voters, I assume these, if we're assuming for the sake of argument, and I really don't know at all if this is true or not, but let's assume for the sake of argument that we have a hypothetical county in Illinois, and a majority of the voting age people in that county, eligible voters, are Republicans, and they would like to have a Republican voice heard in the election, logically enough. Why wouldn't they, if these electronic poll books are not very expensive, why wouldn't they just tell the county governors who they presumably elected to take advantage of that? Well, the people we're concerned about with election day registration, particularly in-precinct election day registration, are people who presumably are relatively not that politically active, people who haven't registered before election day. Well, that's true, but I'm just saying that the politically active people in the county control the county governance structure, and if they think it's going to be an advantage to their political party, they'll do what they need to do, as some counties have done, by the way, to make sure that this option is available. They could do that, but of course getting one's elected officials to take any particular course of action is not necessarily ever an easy matter, and it's something that... So it's easier to go to the courts? Well, this is something that people in the high-population counties don't have to do at all, whereas it is a significant burden for people to organize to get elected officials to take action. But the high-population counties are not similarly situated in terms of population turnover, in terms of age, quality. It seems to me that you are equating things that are not the same. Well, there might well be factors, especially in Chicago, that are different with respect to voter turnout and things like that. It's certainly not so obvious as you go down the list of... No, population turnover. So if you've got a very stable population in one of the southern rural counties, and Cook County is probably not the same. Well, it's a lot less obvious that that's true in counties other than Cook County as you go down the list of the top 20 counties. What, DuPage? DuPage has huge turnover. That could be true, but again, it's not just Cook County, and it's not even just the collar counties. It's the 20 counties with a population of 100,000 or more. So the legislature, in your view, made a mistake by trying to defer to the budgetary concerns of the smaller counties. That's right. They should have just passed a law that said we're going to do this across the board. That's right. They should have done it. If they were going to do it, they should have made it equally available to everyone. And we don't know whether it's true that the low-population counties couldn't do that because the evidence isn't in the record. Well, that's one of the big problems. I guess I'm just so concerned with the fact that your argument pretends that there is no same-day registration option for this 15% or so of Illinois citizens that we're talking about. But, of course, that's not true. Under this law, everybody in Illinois has a same-day voting at registration plus voting option. It's just that some people, 85% of the population, has a wider array of options than the 15%. That's true, but the opportunity that's given to the low-population counties simply isn't as good. What prevents them from enacting the same system that prevails in Cook County? Well, they could do it, but it could be simply that election authorities are not going to take action, for the most part, unless they're forced to do so because it's inconvenient for them, there may not be a lot of political pressure on them to do it, so they may simply not do it. That seems very speculative to me. Let me take you here, please. You know, you've argued that the voter turnout will be relatively suppressed where EDR is available only at a centralized location, but there is no voter suppression here at all that I can see. No one will be in a worse circumstance as a voter than before the amendment because the question is one of increased availability of voting options, not suppression. Well, no one is worse off in absolute terms than they were before, but voters are now worse off in relative terms because the state has guaranteed an opportunity to people in the higher-population counties that it hasn't guaranteed to these people in lower-population counties. It's created a situation of inequality that didn't previously exist, and that's the problem. It's fine for the state to seek new ways to give voters opportunities to vote, but it has to do it in a fair and equal way. So what does inequality mean? Suppose in Cook County no one is further than three miles from a place where they can register, and suppose in one of the rural counties three miles isn't realistic because you'd be in the middle of a corn field or a soybean field, so it's 15 miles instead. That's unequal. Does that violate some constitutional provision in your view? I'm sorry. Is the question whether just the different distances? The precincts are likely to be bigger. That's basically what I'm saying. The precincts are likely to be geographically bigger, so it takes you more time, more gas to drive, or if you probably don't have Uber down there, but probably more difficult logistically to get to your polling place. Is that unconstitutional? Well, it's always going to be the case that some people are, not everyone can live equally close to a polling place. That's obvious. Even under neutral laws it will be somewhat more difficult for some people to get to the polling place and register and vote than others. So geographical difference isn't going to make the difference. But when you have the state guaranteeing something that definitely makes it easier to register and vote and that it will virtually certainly result in more people voting where it's available, then the state is favoring some voters over others. But it doesn't know how those people are going to vote. They could all be in DuPage County voting Republican. Well, the partisan effects aren't essential to the constitutional claim. Well, but the Republican Central Committee is one of your clients, the Crawford. So there's a partisan dimension, at least from your client's point of view. Well, of course. They want to make sure that there would be voters on an equal footing with voters. That's why I mentioned the Republicans. Sure. And, again, it's a matter of common sense and the experts' report that there's going to be greater voter turnout and greater participation where this is available, where Election Day registration is available generally, and then in particular where it's available at polling places. And so the district court didn't abuse its discretion in concluding that this imposes a heavy burden on the voters in low-population counties where this hasn't been guaranteed. Did you have any testimony from a voter saying this imposes a heavy burden on me? Or did you just have your – I thought you just had your expert. That's right. It's just the expert because – You didn't have any voter. This reminds me a little bit of the Crawford case that went to the Supreme Court that was concerned that there was simply no evidence in the record of the kind of burden that the plaintiffs had alleged there in that particular case, as you'll remember. It was voter ID. But the idea that the court was stressing, that you need an evidentiary record before you start interfering with state regulations of the election process, I think is relevant here as well. Well, it would be extremely difficult to find a voter who would not register but for the availability of in-policing Election Day registration because if you can identify that person, you can just help them go ahead and register. They're not going to be injured. It's the people we don't see who are going to be injured by this, the people who end up not voting. But you could have found people in households and said, did you vote in the November 16, 2016 election? No, I didn't. Why didn't you vote? Because I couldn't register at my precinct if there were such a person. So historically, you can't – if you can figure out how we can roll the clock back, I would like your secret because there are plenty of things many of us would do. But you can get historical information. And we may well come up with that information as the case proceeds. But you didn't have it here. We did not have specific information about voters who were burned. If you don't have such a person, how do you know such a person exists? It's a virtual certainty that there will be people who would vote if they could simply walk into their precinct polling place and register and vote on Election Day who won't vote if that's not available to them. Because obviously that greatly reduces the costs of registering and voting. And it's consistent with the academic literature on Election Day registration. And it's also consistent with the state's rationale for providing in-precinct Election Day registration in the higher population counties. The state wants to do this because it wants to make it easier for people to register and vote because the state believes this will increase voter participation. Well, if that's true in the high population counties, whether the effect is stronger there or not, it's safe to assume that it's also going to be true in the lower population counties that more people are going to vote. Is there any indication that voters in the low population counties will be impaired in their ability to vote with EDR, at least as compared to the magnitude of delays that are experienced in the high population areas, you know, with the previous system? We don't have specific evidence on that point. But as for the delays that the state has asserted happened in Chicago and Cook County, one, the state didn't present that justification to the district courts. The district court couldn't have abused its discretion in not crediting that justification for the law. But putting that aside, it doesn't even explain what the state did because, again, the state guaranteed this in the 20 Illinois counties with a population of 100,000 or more, not just the one county where it says that this problem occurred where you had long lines at the polling places. So that can't really explain what the state did here. And the cost argument that the state relies on, the idea that election authorities in low population counties didn't have the resources, just isn't a good justification because it means that the state can give worse rights and worse opportunities to people simply because they happen to live in a county with less resources and a less wealthy county. But, of course, wealth is not a suspect classification, as we know. No, but the courts have said that when it comes to voting, the courts are very concerned with geographic discrimination. But again, Crawford makes it clear that states have a wide range of authority to regulate the voting process, and the court did not jump to a very strict level of scrutiny in that case. I see my time is up. You can certainly wrap up with a final thought, if you like. Thank you, Your Honor. I'd just point out that the law in Crawford County was facially neutral, and this law is not because it guarantees some people better rights than others. So if the court concludes this case is not moved, we respectfully request that it affirm the district court's order. All right. Thank you very much. Anything further, Mr. Franklin? I should say General Franklin. Mr. Spahn. Just one quick point, Your Honor. Of course, I'm happy to take the court's questions. I think the appellee's presentation just now only reaffirms what we saw in the briefs, and that is that the plaintiff's position here really elevates the consideration of geographic uniformity, or at least geographic uniformity with respect to the mandatory scope of this particular amenity over all of the other considerations that the state is entitled to take into account when it crafts its registration and voting procedures. That kind of elevation of one factor over all others runs counter to what this court and the Supreme Court have repeatedly said, as Your Honor just mentioned, which is that states have broad authority to regulate the time, place, and manner of elections, or as this court put it in Griffin, that these kinds of balancing judgments are quintessentially legislative judgments with which the courts should not interfere unless they are strongly convinced that the legislative judgment is grossly awry. If there are no questions, we would ask this court reverse, and I thank you for your time. All right. Thank you very much. Thanks to both counsel. We will take the case under advisement.